1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

WEI ZHANG, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

vs.

UPSTART HOLDINGS, INC., DAVID J. GIROUARD, and SANJAY DATTA,

Defendants.

Case No.:

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Wei Zhang ("Plaintiff"), by and through Plaintiff's attorneys, alleges the following upon information and belief, except as to allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief are based upon, among other things, the investigation by Plaintiff's counsel, which includes, without limitation: (a) review and analysis of public filings made by Upstart Holdings, Inc. ("Upstart" or the "Company") with the United States ("U.S.") Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants (defined below) and other parties; (c) review of news articles, shareholder communications, conference calls, and postings on Upstart's website concerning the Company's public statements; and (d) review of other publicly available information concerning Defendants.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all persons or entities who purchased Upstart securities between March 18, 2021 and May 9, 2022, inclusive (the "Class Period") against Upstart and certain of its officers (collectively "Defendants") seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the SEC.

2.     Upstart is a financial technology firm that uses artificial intelligence ("AI") and data science to underwrite consumer credit.  The Company partners with banks to offer credit to consumers, either through the Upstart website or through banking partner websites embedded with Upstart technology.  Upstart claims that its underwriting process allows banking partners to originate credit with higher approval rates, lower loss rates, and a high degree of automation.

3.     Throughout the Class Period, Defendants claimed that the lack of loans the Company retained on its balance sheet ensured it only was exposed to limited credit risk.  In reality, as investors

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

1
2
3

learned after markets closed on May 9, 2022, the Company's highly touted, AI underwriting model was unable to adequately assess credit risk in changing macroeconomic conditions.  As a result, Upstart had been increasingly underwriting progressively less creditworthy loans throughout the Class Period.

4
5
6
7
8
9
10
11
12
13
14
15
16

4.      Investors learned the truth during the Company's first quarter 2022 earnings call with analysts when Upstart admitted that the loans the Company had been forced to retain on its balance sheet had ***more than doubled in a single quarter***.  Specifically, Chief Financial Officer ("CFO") Sanjay Datta ("Datta") reported that the "balance of loans, notes, and residuals at the end of the quarter was . . . up to $604 million from $261 million in Q4."  Datta attributed the increase of loans on the Company's balance sheet to "rising interest rates and rising consumer delinquencies putting downward pressure on conversion."  Datta acknowledged that "historically, [the Company's] balance sheet has been almost exclusively for the purposes of R&D," but in the first quarter of 2022, the Company used the balance "to do . . . sort of a market clearing mechanism."  He further stated that Upstart had "started to selectively use [its] capital as a funding buffer for core personal loans in periods of interest rate fluctuation where the market clearing price is in flux."

17
18
19
20
21
22
23

5.      Reporting on the Company's results, one analyst dismissed the Company's purported "market clearing" justification and explained that the increase in loans on the Company's balance sheet represented a "divergence" from the Company's "capital-light business model" that indicated the Company had "few alternatives other than to hold more loans due to funding issues."  In response to this disclosure, the price of Upstart common stock cratered 56% the following trading day, from a closing price of $77.13 on May 9, 2022, to a closing price of $33.61 on May 10, 2022.

24
25
26
27

6.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities when the truth was disclosed, Plaintiff and other Class members have suffered significant losses and damages.

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

9.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in substantial part in this Judicial District, as Upstart is headquartered in this Judicial District.

10.      In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

11.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Upstart securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12.      Defendant Upstart is incorporated under the laws of Delaware with its principal executive offices located in San Mateo, California.  Upstart's common stock trades on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "UPST."

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

3

13.     Defendant David J. Girouard ("Girouard") was a co-founder of the Company and has served as Upstart's President, Chief Executive Officer ("CEO"), and Chairperson of the Board of Directors at all relevant times.

14.     Defendant Datta has served as Upstart's CFO at all relevant times.

15.     Defendants Girouard and Datta (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.   The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material nonpublic information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading.   The Individual Defendants are liable for the false statements pleaded herein.

16.     The Company and the Individual Defendants are collectively referred to as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

17.     Headquartered in San Mateo, California, Upstart was founded in 2012 on the premise the Company could disrupt the credit origination process with a smarter credit model that allows lenders to approve more loans with fewer defaults.   The Company went public through an initial public offering on December 16, 2020.

18.     Upstart generates revenue by charging fees, either on a dollar or percentage basis, on loans the Company underwrites.  The Company further charges the banking partners a referral fee each time the Company refers a loan to a given bank and a platform fee each time the banking partner originates a loan using the Upstart platform.

19.     Loans underwritten by Upstart, which the Company refers to as "Upstart powered loans," are funded in one of three ways.  Banking partners will fund loans the banks want to keep on their balance sheet.  For loans that are not retained by banks, Upstart seeks to securitize loans for investment by institutional investors.   When neither the Company's banking partners nor the institutional investors are willing to fund the loans, Upstart will fund the loans from its own balance sheet.

20.     During the Class Period, Upstart asserted in its filings with the SEC that the Company had little exposure to credit risk from "Upstart-powered loans" because the "percentage of loans funded through our balance sheet has generally decreased, while the percentage of loans purchased by institutional investors has generally increased."

**<u>Materially False and Misleading Statements Issued During the Class Period</u>**

21.     The Class Period begins on March 18, 2021.[1]  After markets closed the prior day, March 17, 2021, Upstart announced its financial results for the fourth quarter and full year of 2020.  During the conference call on March 17, 2021, accompanying the release of the financial results, Defendant Girouard stated: "Upstart is a fee-based business. We don't make loans, and ***we aren't exposed to material balance sheet risk.***"   Defendant Datta stated that "in terms of loan assets, we carried an aggregate balance of loans, notes and residuals of $98 million at the end of 2020, down from $266 million at the end of 2019, reflecting the continued reduction of platform loans funded through our own

---

[1] Unless otherwise stated, all emphases in both bold and italics hereinafter is added.

balance sheet." Defendant Datta touted how the amount of loans the Company retained as assets on its balance sheet "represents the totality of direct exposure to credit risk."

22.    During a conference call with analysts on May 11, 2021, which accompanied the Company's release of its financial results for the first quarter of 2021, Defendant Girouard explained the Company's rapid growth was "primarily technology and model-driven, which manifests as increasing conversion rates in our borrower funnel." The Company's "conversion rate" metric is "the number of loans transacted in a period divided by the number of rate inquiries received that [Upstart] estimate[s] to be legitimate." On the call, Defendant Datta noted the Company's "conversion rate of 22% on rate requests, up from 14% over the prior year." Defendant Datta then highlighted that the Company:

> carried an aggregate balance of loans, notes, and residuals of $73.2 million, down from $227.5 million at the end of the same quarter in the prior year. ***This reflects the continuing reduction in the percentage of platform loans funded through our own balance sheet***. It's highlighted during our last earnings call these loan assets represent the totality of the direct exposure to credit risk.

23.    During a June 9, 2021, Bank of America Global Technology Conference, Defendant Girouard made the positive comparison of Upstart to a "subprime lender lending off your balance sheet," noting "they are balance sheet lenders which have their own limits." Girouard then touted that Upstart's revenues are not "anything related to quality of credit performance." In response to Bank of America analyst Nat Schindler asking how Upstart would "respond to a change in the credit cycle?," Girouard contended "we will handle that recession far better than a traditional system would" and that the Company had "a great proof point that a model like ours actually can handle disruptions in the economy and dislocations better than a standard model."

24.    On August 10, 2021, Upstart issued a press release announcing its financial results for the second quarter of 2021. During the corresponding call with analysts, Defendant Datta reported on

---

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

the state of the Company's balance sheet, stating, "[i]n terms of loans assets, we carried an aggregate balance of loans, notes, and residuals of $95.3 million, up from $73.2 million in Q1 and down from $148 million at the end of the same quarter in the prior year."  Defendant Datta again explained, "these loan assets represent the totality of the direct exposure we have to credit risk."

25.    On November 9, 2021, Upstart issued a press release announcing its financial results for the third quarter of 2021.  That press release stated, in relevant part:

**Third Quarter 2021 Financial Highlights**

- **Revenue.** Total revenue was $228 million, an increase of 250% from the third quarter of 2020. Total fee revenue was $210 million, an increase of 235% year-over-year.

- **Transaction Volume and Conversion Rate.** Bank Partners originated 362,780 loans, totaling $3.13 billion, across our platform in the third quarter, up 244% from the same quarter of the prior year. Conversion on rate requests was 23% in the third quarter of 2021, up from 15% in the same quarter of the prior year. Beginning in the third quarter of 2021, in order to better reflect actual conversions, we removed rate inquiries identified by our platform as likely fraudulent from our Conversion Rate calculation. Please see the section titled "Key Operating Metrics" below for further detail on the calculation and related information about prior periods.

- **Income from Operations.** Income from operations was $28.6 million, up from $12.2 million the prior year.

- **Net Income and EPS.** GAAP net income was $29.1 million, up from $9.7 million in the third quarter of 2020. Adjusted net income was $57.4 million, up from $12.3 million in the same quarter of the prior year. Accordingly, GAAP diluted earnings per share was $0.30, and diluted adjusted earnings per share was $0.60 based on the weighted-average common shares outstanding during the period.

- **Contribution Profit.** Contribution profit was $95.9 million, up 184% from in the third quarter of 2020, with a contribution margin of 46% compared to a 54% contribution margin in the same quarter of the prior year.

- **Adjusted EBITDA.** Adjusted EBITDA was $59.1 million, up from $15.5 million in the same quarter of the prior year. The third quarter 2021 adjusted EBITDA margin was 26% of total revenue, up from 24% in the third quarter of 2020.

**Financial Outlook**

For the fourth quarter of 2021, Upstart expects:

- **Revenue** of $255 to $265 million

- **Contribution Margin** of approximately 47%

- **Net Income** of $16 to $20 million

- **Adjusted Net Income** of $48 to $50 million

- **Adjusted EBITDA** of $51 to $53 million

- **Basic Weighted-Average Share Count** of approximately 81.9 million shares

- **Diluted Weighted-Average Share Count** of approximately 96.7 million shares

26.     In the corresponding call with analysts, Defendant Datta noted an uptick of the "aggregate balance loans, notes and residuals of $140 million," which was "up from $95.3 million in Q3 and down from $145 million at the end of the same quarter in the prior year."  Defendant Datta denied that the increase had anything to do with the deteriorating quality of Upstart's loans, and instead claimed that the reason the "dollar volume of loans we carry is edging upwards" was the Company's "*use of our balance sheet to the scaling of our growing auto product, as well as our expansion into lower-credit score segments of personal lending.*"

27.     On November 12, 2021, Upstart filed its quarterly report on Form 10-Q for the period ended September 30, 2021, affirming the previously reported financial results.  Therein, the Company stated that "Upstart-powered loans are originated in reliance on the fact that our bank partners are the 'true lenders' for such loans."  As to the AI-model powering the Company's platform, Upstart stated:

> *If we are unable to continue to improve our AI models or if our AI models contain errors or are otherwise ineffective, our growth prospects, business, financial condition and results of operations would be adversely affected.*

Our ability to attract potential borrowers to our platform and increase the number of Upstart-powered loans will depend in large part on our ability to effectively evaluate a

borrower's creditworthiness and likelihood of default and, based on that evaluation, offer competitively priced loans and higher approval rates. Further, our overall operating efficiency and margins will depend in large part on our ability to maintain a high degree of automation in our loan application process and achieve incremental improvements in the degree of automation. If our AI models fail to adequately predict the creditworthiness of borrowers due to the design of our models or programming or other errors, and our AI models do not detect and account for such errors, or any of the other components of our credit decision process fails, we may experience higher than forecasted loan losses. Any of the foregoing could result in sub-optimally priced loans, incorrect approvals or denials of loans, or higher than expected loan losses, which in turn could adversely affect our ability to attract new borrowers and bank partners to our platform, increase the number of Upstart-powered loans or maintain or increase the average size of loans facilitated on our platform.

Our AI models also target and optimize other aspects of the lending process, such as borrower acquisition, fraud detection, default timing, loan stacking, prepayment timing and fee optimization, and our continued improvements to such models have allowed us to facilitate loans inexpensively and virtually instantly, with a high degree of consumer satisfaction and with an insignificant impact on loan performance. However, such applications of our AI models may prove to be less predictive than we expect, or than they have been in the past, for a variety of reasons, including inaccurate assumptions or other errors made in constructing such models, incorrect interpretations of the results of such models and failure to timely update model assumptions and parameters. ***Additionally, such models may not be able to effectively account for matters that are inherently difficult to predict and beyond our control, such as macroeconomic conditions, credit market volatility and interest rate fluctuations, which often involve complex interactions between a number of dependent and independent variables and factors. Material errors or inaccuracies in such AI models could lead us to make inaccurate or sub-optimal operational or strategic decisions, which could adversely affect our business, financial condition and results of operations.***

Additionally, errors or inaccuracies in our AI models could result in any person exposed to the credit risk of Upstart-powered loans, whether it be us, our bank partners or investors in our loan funding programs, experiencing higher than expected losses or lower than desired returns, which could impair our ability to retain existing or attract new bank partners and investors to participate in our loan funding programs, reduce the number, or limit the types, of loans bank partners and investors are willing to fund, and limit our ability to increase commitments under our warehouse and other debt facilities. Any of these circumstances could reduce the number of Upstart-powered loans and harm our ability to maintain a diverse and robust loan funding program and could adversely affect our business, financial condition and results of operations.

(First emphasis in original.)

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

28.     On February 15, 2022, Upstart issued a press release announcing financial results for the fourth quarter and full year of 2021, which ended December 31, 2021.   That press release stated, in relevant part:

**Full Year 2021 Financial Highlights**

- **Revenue.** Total revenue was $849 million, an increase of 264% from 2020. Total fee revenue was $801 million, an increase of 251% year-over-year.

- **Transaction Volume and Conversion Rate.** Bank partners originated 1.3 million loans, totaling $11.8 billion, across our platform in 2021, up 338% from the prior year. Conversion on rate requests was 24% 2021, up from 15% in the prior year.

- **Income from Operations.** Income from operations was $141 million, up from $11.8 million the prior year.

- **Net Income and EPS.** GAAP net income was $135 million, up from $6.0 million in 2020. Adjusted net income was $224 million, up from $17.5 million in the prior year. Accordingly, GAAP diluted earnings per share was $1.43, and diluted adjusted earnings per share was $2.37 based on the weighted-average common shares outstanding during the period.

- **Contribution Profit.** Contribution profit was $398 million, up 279% from 2020, with a contribution margin of 50% compared to a 46% contribution margin in the prior year.

- **Adjusted EBITDA.** Adjusted EBITDA was $232 million, up from $31.5 million in the prior year. Full year 2021 adjusted EBITDA margin was 27% of total revenue, up from 13% in 2020.

**Financial Outlook**

For the first quarter of 2022, Upstart expects:

- **Revenue** of $295 to $305 million

- **Contribution Margin** of approximately 46%

- **Net Income** of $18 to $22 million

- **Adjusted Net Income** of $50 to $52 million

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

10

- **Adjusted EBITDA** of $56 to $58 million

- **Basic Weighted-Average Share Count** of approximately 84.3 million shares

- **Diluted Weighted-Average Share Count** of approximately 95.9 million shares

For the full year 2022, Upstart expects:

- **Revenue** of approximately $1.4 billion

- **Contribution Margin** of approximately 45%

- **Adjusted EBITDA** of approximately 17%

29.     During the corresponding conference call with analysts that day, Defendant Datta assured investors the Company was "cognizant of the fluidity in the macro environment," but that the Company was "not expecting any meaningful adverse impact from rising defaults on our volumes or economics."   Explaining that the Company had "$170 million [that] was reinvested back into our balance sheet in the form of loans made in support of new R&D programs," Defendant Datta reported that the "balance of loans, notes and residuals at the end of the year was $261 million, up from $140 million in Q3 and reflecting the accelerated pace of R&D."

30.     On February 18, 2022, Upstart filed its annual report on Form 10-K for the period ended December 31, 2021 (the "2021 10-K"), affirming the previously reported financial results.  Therein, the Company stated that "[l]oans issued through [its] platform can be retained by [Upstart's] originating bank partners, distributed to our broad base of institutional investors and buyers that invest in Upstart-powered loans or funded by Upstart's balance sheet."  It further stated that for fiscal 2021, "16% of the loans funded through our platform were retained by the originating bank and 80% of loans were purchased by institutional investors through our loan funding programs."  The 2021 10-K also touted the Company's AI-lending platform as "central to [Upstart's] value proposition and unique position in the industry" because it "incorporate[s] more than 1,500 variables [and] ha[s] been trained by more

than 21.6 million repayment events."  It also contained "Risk Factors" substantially similar to that identified in ¶ 27.

31.     The above statements identified in ¶¶ 21-30 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants mislead investors and/or failed to disclose that: (i) Upstart's AI underwriting model could not and did not adequately account for macroeconomic factors such as interest rate increases and the end of the U.S. government stimulus; (ii) as a result, Upstart was experiencing negative impacts on its conversion rate; (iii) as a result, the Company was reasonably likely to use its balance sheet to fund loans, rendering its balance sheet highly exposed to credit risk; and (iv) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

### **The Truth Emerges**

32.     On May 9, 2022, after the market closed, Upstart issued a press release announcing its financial results for the first quarter of 2022, which ended March 31, 2022, and guidance for the second quarter and full-year 2022.  Therein, the Company reduced its fiscal 2022 guidance, expecting revenue of approximately $1.25 billion and contribution margin of 48%.  The press release included the Company's unaudited Consolidated Balance Sheet for the quarter, which showed the ***loans on the Company's balance sheet had more than doubled in just one quarter***: from $252,477,000 for the period ending December 31, 2021, to $597,981,000 for the period ended March 31, 2022.

33.     During the conference call accompanying the release of the financial results, Defendant Girouard was forced to concede the Company "observed more volatility" for loans funded by

---

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

institutions and capital markets, which Girouard attributed to "the abrupt termination of [government] stimulus programs [which] caused some of the more recent vintages to underperform."

34.    During the same call, Defendant Datta reported that the Company's "balance of loans, notes, and residuals at the end of the quarter was . . . up to $604 million from $261 million in Q4." Defendant Datta cited factors in the macro environment, including "rising interest rates and rising consumer delinquencies [as] putting downward pressure on conversion." He further stated that Upstart has "started to selectively use [its] capital as a funding buffer for core personal loans in periods of interest rate fluctuation where the market clearing price is in flux." Defendant Datta further acknowledged the substantial increase to loans maintained on the Company's balance sheet was the result of "loan default rates" from loans from the "two or three vintages" of loans since the expiration of government stimulus.

35.    Though Defendant Datta acknowledged that, "historically, [Upstart's] balance sheet has been almost exclusively for the purpose of R&D," in the last quarter the Company used it "to do . . . sort of a market-clearing mechanism." He stated:

> And by that, what I mean is when interest rates in the economy change quite quickly, I think it would be fair to say that our platform, ***its ability to react to the new market-clearing price, it's probably not as nimble as we would like***.
>
> ***It's somewhat manual. It requires a bunch of conversations and phone calls.*** And so when interest rates smooth and investors are -- so each deciding what their new return hurdles are, there can be a gap or a delay in responding to funding. And that's a situation where we've chosen to sort of step in with our balance sheet and almost sort of bridge to the new market-clearing price.
>
> And if that is happening often and abruptly, we've been sort of playing that role with our balance sheet. I don't view that to be a long-term or necessarily sizable activity for us. I think that developing the mechanisms to respond more nimbly to new price discovery as rates change is something that's on our road map, and something that we want to start to invest in so that it can happen in a much more automated way. At the end of the day, we view our platform as being a platform that responds to risk and rates in the environment.

36.     In response to this disclosure, on the following trading day of May 10, 2022, the price of Upstart shares declined 56%, from a closing price of $77.13 per share on May 9, 2022, to a closing price of $33.61 per share on May 10, 2022.

37.     In a report issued on May 10, 2022, Wedbush analyst David Chiaverini ("Chiaverini") noted that "[w]hile the Company claims that its decision to keep more loans on-balance sheet was used as a market clearing mechanism due to interest rate moves, *we see this as a divergence from its capital-light business mode*l and could indicate [Upstart] has few alternatives other than to hold more loans due to funding issues."

38.     In a subsequent report on May 13, 2022, Wedbush's Chiaverini highlighted a Kroll Bond Rating Agency ("Kroll") surveillance report on Upstart's securitization trusts and passthrough trust in which Kroll "now expects loss rates to be higher than previously expected for Upstart's pass-through securitizations issued in 2021."   Chiaverini further observed that *Upstart began a loan modification program*, which had increased materially in volume between March and April 2022. Commenting on the Kroll report, Chiaverini noted "Kroll now expects loss rates to be higher than previously expected for Upstart's pass-through trust securitizations issued in 2021."

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

39.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class, consisting of all persons and entities that purchased Upstart securities during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

40.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Throughout the Class Period, Upstart common stock actively traded on the NASDAQ (an open and efficient market) under the symbol "UPST."  Millions of Upstart shares were traded publicly during the Class Period on the NASDAQ.  As of April 29, 2022, the Company had more than 84 million shares outstanding.  Record owners and other members of the Class may be identified from records maintained by Upstart or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions

41.    Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

42.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests that conflict with those of the Class.

43.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

b.    whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

c.       whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, operations, and prospects of Upstart;

d.       whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of Upstart;

e.       whether the market price of Upstart securities during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f.       the extent to which the members of the Class have sustained damages and the proper measure of damages.

44.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

45.     The market for Upstart stock was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, Upstart securities traded at artificially inflated and/or maintained prices during the Class Period.  Plaintiff and other members of the Class purchased the Company's securities relying upon the integrity of the market price of Upstart securities and market information relating to Upstart and have been damaged thereby.

---

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

46.     At all times relevant, the market for Upstart securities was an efficient market for the following reasons, among others:

a.      Upstart was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.      As a regulated issuer, Upstart filed periodic public reports with the SEC and/or the NASDAQ;

c.      Upstart regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d.      Upstart was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

47.     As a result of the foregoing, the market for Upstart securities promptly digested current information regarding Upstart from all publicly available sources and reflected such information in Upstart's stock price.  Under these circumstances, all purchasers of Upstart stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices, and a presumption of reliance applies.

48.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded in Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information

regarding the Company's business, operations, and prospects—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## UNDISCLOSED ADVERSE INFORMATION

49. The market for Upstart's securities was an open, well-developed, and efficient market at all relevant times. As a result of the materially false and/or misleading statements and/or omissions particularized in this Complaint, Upstart's securities traded at artificially inflated prices during the Class Period. Plaintiff and the other members of the Class purchased Upstart's securities relying upon the integrity of the market price of the Company's securities and market information relating to Upstart and have been damaged thereby.

50. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Upstart's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Upstart's business, operations, and prospects as alleged herein. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its business, thus causing the Company's securities to be overvalued and artificially inflated or maintained at all relevant times. Defendants' materially false and/or misleading statements during the Class Period directly or proximately caused or were a substantial contributing cause of the damages

sustained by Plaintiff and other members of the Class who purchased the Company's securities at artificially inflated prices and were harmed when the truth was revealed.

## SCIENTER ALLEGATIONS

51.     As alleged herein, Defendants acted with scienter in that Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

52.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Upstart, their control over, receipt and/or modification of Upstart's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning Upstart, participated in the fraudulent scheme alleged herein.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

53.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

54.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Upstart who knew that the statement was false when made.

## LOSS CAUSATION

55.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

56.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive the market.  This artificially inflated the prices of Upstart's securities and operated as a fraud or deceit on the Class.   When Defendants' prior misrepresentations, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of Upstart's stock fell precipitously, as the prior artificial inflation came out of the price.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

57.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

58.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Upstart securities; and (iii) cause Plaintiff and other members of the Class to purchase Upstart

stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

59.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Upstart securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

60.     Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Upstart's business, operations, and prospects, as specified herein.  Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Upstart's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Upstart and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

61.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or

director at the Company during the Class Period and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

62.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Upstart's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its securities.   As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

63.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Upstart securities was

artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class purchased Upstart securities during the Class Period at artificially inflated prices and were damaged thereby.

64.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the truth regarding the problems that Upstart was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased their Upstart securities, or, if they had purchased such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

65.    By virtue of the foregoing, Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

66.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

67.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

68.    The Individual Defendants acted as controlling persons of Upstart within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the

Company, participation in, and/or awareness of the Company's operations and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

69. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

70. As set forth above, Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

A. Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.      Awarding Plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

C.      Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

D.      Awarding such other relief as this Court deems appropriate.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: June 22, 2022

Respectfully submitted,

**POMERANTZ LLP**

By: */s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

**POMERANTZ, LLP**
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com

***Attorneys for Plaintiff***